# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------------------------- x
                                        :
BLOCKCHAIN LUXEMBOURG S.A. &            :
BLOCKCHAIN (US), INC.,                  :
                                        :
                    Plaintiffs,         :         Case No: 1:18-cv-08612-GBD
                                        :
         v.                             :         Hon. George B. Daniels
                                        :
PAYMIUM, SAS a/k/a BLOCKCHAIN.IO &      :
PIERRE NOIZAT,                          :
                                        :
                    Defendants.         :
--------------------------------------------------------- X
```

# DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR
## <u>MOTION TO DISMISS PLAINTIFFS' COMPLAINT</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................... 1

I.    Statement of Facts ........................................................................................... 1

LEGAL STANDARD ............................................................................................. 5

I.    Motion to Dismiss ........................................................................................... 5

ARGUMENT ........................................................................................................... 6

I.    Having Disclaimed the BLOCKCHAIN Trademark, BLK Does Not Have a
Protectable Trademark Under Lanham Act § 32 and § 43(a)(1)(A) ................... 6

    A. Introduction ................................................................................................. 6

    B. BLOCKCHAIN Is Descriptive of BLK's Goods and Services ...................... 7

        1.    The Trademark Office Has Found That BLOCKCHAIN Is Inherently Descriptive,
and BLK Acquiesced in That Determination ............................................... 7

        2.    BLK Cannot Establish Secondary Meaning Prior To Paymium's February Adoption
Of Its BLOCKCHAIN.IO Mark, Nor At Any Time ....................................... 8

    C.    No Jury Will Find Similarity Between the Logo marks .............................. 13

II.    BLK Cannot Succeed on Its False Advertising Claims .................................... 13

    A.    BLK Cannot Plead That It Was Proximately Injured By Any of Paymium's
Statements ............................................................................................... 14

    B.    BLK's "Registered Security" Statement Is Not a Statement Promoting Paymium's
Goods and Services .................................................................................. 16

    C.    Paymium's Statement That Its Exchange Will Feature "Atomic Swaps" Is Clearly A
Non-Falsifiable Prospective Statement ...................................................... 17

    D.    BLK's Allegation That Paymium Misrepresents Itself as Being "Hack-free Since
2013" is False on its Face........................................................................ 18

III.    BLK Has Not Pled a Cognizable Claim Under NYGBL § 349 ........................ 19

IV.    Defendant Noizat Should Not Be Charged as an Individual Party, as BLK Has
Made No Specific Allegations of Direction and Control ................................. 20

i

V.   There is No Personal Jurisdiction Over the Individual Defendant Pierre Noizat .............. 21

    A.   The Basis For Jurisdiction Over Mr. Noizat Is Not Derivative Of The Basis For Paymium ........................................................................................................................... 21

    B.   Personal Jurisdiction Over Mr. Noizat In His Individual Capacity Does Not Comport with the Due Process Clause ........................................................................................ 22

VI.   BLK Has Not Pled a Cognizable Claim Under NYGBL § 350 ........................................ 23

VII.   BLK Has Not Pled a Cognizable Claim Under NYGBL § 360-L ..................................... 23

VIII. BLK Has Not Pled a Cognizable Claim of Unfair Competition Under New York Common Law ..................................................................................................................................... 24

IX.   BLK Has Not Pled a Cognizable Claim of Misappropriation Under New York Common Law ..................................................................................................................................... 24

CONCLUSION ......................................................................................................................... 25

# **TABLE OF AUTHORITIES**

## **Cases**

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe,*
   131 F. Supp. 3d 196 (S.D.N.Y. Sept. 18, 2015)........................................................ 8, 9, 23, 24

*Abercrombie & Fitch Co., Hunting World, Inc.,*
   537 F.2d 4 (2d Cir. 1976)............................................................................................... 13

*Alibaba Grp. Holding Ltd. v. Alibabacoin Found.,*
   No. 18-CV-2897 (JPO), 2018 WL 2022626 (S.D.N.Y. Apr. 30, 2018) .................................... 3

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ........................................................................................................ 6

*Blockchain Mining Supply & Services Ltd. v. Super Crypto Mining, Inc.,*
   1:18-cv-11099-ALC (S.D.N.Y. filed Nov. 28, 2018) ............................................................ 11

*Blockchain Tech. Corp. v. RVH Inc.,*
   1:18-cv-09352-AJN (S.D.N.Y. filed Oct. 12, 2018) ............................................................. 11

*Calvin Klein Jeanswear Co. v. Tunnel Trading,*
   No. 98 CIV. 5408 (THK), 2001 WL 1456577 (S.D.N.Y. Nov. 16, 2001) ............................... 20

*Chloé v. DesignersImports.com USA, Inc.,*
   No. 07-CV-1791 (CS)(GAY), 2009 WL 1227927 (S.D.N.Y. Apr. 30, 2009) ......................... 20

*Chloé v. Queen Bee of Beverly Hills,*
   616 F.3d 158 (2d Cir. 2010).......................................................................................... 21

*Chloe v. Queen Bee of Beverly Hills, LLC,*
   No. 06–cv–3140, 2011 WL 3678802 (S.D.N.Y. Aug. 19, 2011) ........................................... 20

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.,*
   696 F.3d 206 (2d Cir. 2012)........................................................................................... 8

*Commodity Futures Trading Comm'n v. McDonnell,*
   287 F. Supp. 3d 213 (E.D.N.Y. Mar. 6, 2018) .......................................................... 3

*Converse, Inc. v. Int'l Trade Comm'n,*
   909 F.3d 1110 (Fed. Cir. 2018)....................................................................................... 8

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991) ............................................................................. 6

*Davidson v. Long Blockchain Corp.*,
    1:18-cv-02182-SN (S.D.N.Y. filed Mar. 12, 2018) ...................................... 12

*DiStefano v. Carozzi North Am., Inc.*,
    286 F.3d 81 (2nd Cir. 2001) ......................................................................... 21

*Duty Free Americas, Inc. v. Estée Lauder Cos.*,
    No. 12–60741, 2014 WL 1329359 (S.D. Fla. Mar. 31, 2014) ..................... 17

*Echo Travel, Inc. v. Travel Associates, Inc.*,
    870 F.2d 1264 (7th Cir. 1989) ...................................................................... 12

*Gordon & Breach Sci. Publ'rs S.A. v. Am. Inst. Of Physics*,
    859 F. Supp. 1521 (S.D.N.Y. Aug. 15, 1994) .............................................. 17

*Int'l Shoe Co. v. State of Wash. Office of Unemployment Comp. & Placement*,
    326 U.S. 310 (1945) ..................................................................................... 23

*ITC Ltd. v. Punchgini, Inc.*,
    518 F.3d 159 (2d Cir. 2008) ......................................................................... 24

*Johnson v. New York Univ.*,
    No. 17 Civ. 6184 (VEC) (GWG), 2018 WL 3966703 (S.D.N.Y. Aug. 20, 2018) .................... 12

*KatiRoll Co. v. Kati Junction, Inc.*,
    33 F. Supp. 3d 359 (S.D.N.Y. 2014) ............................................................ 20

*Le Book Pub., Inc. v. Black Book Photography, Inc.*,
    418 F. Supp. 2d 305 (S.D.N.Y. 2005) .......................................................... 13

*Levi Strauss & Co. v. Genesco, Inc.*,
    742 F.2d 1401 (Fed. Cir. 1984) .................................................................... 12

*Levin v. Am. Document Servs., LLC.*,
    No. 17-cv-1295, 2018 WL 1358815 (E.D.N.Y. Mar. 16, 2018) .................... 22

*Lexmark Int'l, Inc. v. Static Control Components*,
    572 U.S. 118 (2014) ..................................................................... 14, 15, 16

*Maurizio v. Goldsmith*,
    230 F.3d 518 (2d Cir. 2000) ......................................................................... 19

*McNeillab, Inc. v. Am. Home Prods. Corp.*,
    848 F.2d 34 (2d Cir. 1988) ........................................................................................ 15

*Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*,
    894 F. Supp. 2d 288 (S.D.N.Y. 2012) ...................................................................... 24

*Rovio Entm't, Ltd. v. Allstar Vending, Inc.,*
    97 F. Supp. 3d 536 (S.D.N.Y. 2015) .................................................................. 22, 23

*Sec. & Exch. Comm'n v. Titanium Blockchain Infrastructure Servs., Inc.,*
    1:18-mc-00236-PKC (S.D.N.Y. filed June 4, 2018) ............................................... 12

*Sec. & Exch. Comm'n v. Titanium Blockchain Infrastructure Servs., Inc.*,
    1:18-mc-01525-UAD (E.D.N.Y. filed June 4, 2018) ............................................. 12

*Star Indus. Inc. v. Bacardi & Co.*,
    412 F.3d 373 (2d Cir. 2005) ...................................................................................... 8

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992) .................................................................................................. 7

*United States v. Ulbricht*,
    858 F.3d 71 (2d Cir. 2017) ........................................................................................ 2

*United States v. Zodhiates*,
    901 F.3d 137 (2d. Cir. 2018) ..................................................................................... 2

*Volpe v. Am. Language Commc'n Ctr.*,
    200 F. Supp. 3d 428 (S.D.N.Y. July 29, 2016) ........................................................ 2

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. Aug. 31, 2015) .................................................... 11

*Wolo Mfg. Corp. v. ABC Corp.*,
    No. 17-CV-5333(SJF)(SIL), 2018 WL 5831767 at *10 (E.D.N.Y. Nov. 7, 2018) ................. 22

## **Statutes**

15 U.S.C. § 1114 .......................................................................................................... 6, 7

15 U.S.C. § 1125(a)(1)(A) ............................................................................................ 6, 7

15 U.S.C. § 1125(a)(1)(B) .......................................................................................... 14, 17

N.Y. C.P.L.R. § 302(a) ................................................................................................ 22

New York General Business Law § 350 ...................................................................... 23

New York General Business Law § 349 (a) ........................................................... 19, 23

NYGBL § 360-L ............................................................................................................ 23

**Rules**

Fed. R. Civ. P. 12(b)(2) ................................................................................................ 25

Fed. R. Civ. P. 12(b)(6) ....................................................................................... 2, 5, 6, 25

**Treatises**

3 McCarthy on Trademarks and Unfair Competition § 19:65 ............................................ 7

## PRELIMINARY STATEMENT

The deference standards of *Twombly* and *Iqbal* do not obscure the elephant in the room – this lawsuit is an improper grab at trademark exclusivity in the word BLOCKCHAIN, perhaps the hottest technology buzzword on the planet. While Plaintiffs were prescient and resourceful enough to obtain the domain names blockchain.com and blockchain.info, they may not properly leverage that foresight into an anti-competitive and unearned monopoly in the term

The trademark and unfair competition claims Blockchain Luxembourg S.A. and Blockchain (US) Inc. (collectively "BLK") assert rest on an implausible assertion of exclusivity of use in the term BLOCKCHAIN. Consumers know this is not true by opening a newspaper – this Court can easily take judicial notice of thousands of third party uses of the term – and even BLK knows this isn't so, as it acquiesced in and admitted to the U.S. Trademark Office's determination in March of 2018 that the term BLOCKCHAIN is descriptive, a determination BLK could have contested but did not. The USPTO's determination of descriptiveness, made one month after Paymium's adoption of its own BLOCKCHAIN.IO mark, makes this case one of the rare trademark suits suitable for disposition on a motion to dismiss on grounds of distinctiveness.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Statement of Facts

Plaintiff BLK describes itself as a platform for digital assets, "powering" digital transactions, offering digital payments and other financial services, through the use of digital wallets. (Dkt. 9 at ¶ 1).  A digital wallet is used by a tokenholder to buy, sell, store, and execute transactions involving digital assets, such as cryptocurrency tokens (such as bitcoin). (Dkt. 9 at ¶ 17).

As BLK's own website notes, blockchain is the technology underlying public distributed ledgers that, for example, allow for the exchange of cryptocurrencies. (Dkt. 9 at ¶ 5; Schwimmer Decl., 7); *see also Bitcoin Charts & Graphs*, http://wwww.blockchain.com/charts (last visited Jan. 10, 2019) ("The most trusted source for data on the bitcoin blockchain.").[1]

BLK asserts ownership of federally registered trademark 5,512,148:



Registered July 10, 2018, disclaiming BLOCKCHAIN (the "Block Design Mark") (Dkt. 9 at ¶ 26).  BLK asserts common law rights in the BLOCKCHAIN marks, which it collectively defines as its block design mark, as well as the "Blockchain Word Marks" - BLOCKCHAIN, BLOCKCHAIN.INFO, BLOCKCHAIN.COM, BLOCKCHAIN MERCHANT and BLOCKCHAIN PRINCIPAL STRATEGIES.  (Dkt. 9 at ¶ 24).

BLK alleges first use of BLOCKCHAIN and BLOCKCHAIN.INFO in 2011, BLOCKCHAIN MERCHANT in 2012, BLOCKCHAIN.COM in 2013, and BLOCKCHAIN and block design in 2017. (Dkt. 9 at ¶¶ 19-22).  BLK alleges uses of its marks in relation to "digital wallet services," "mobile app services," and "website services," which it collectively defines as the "Blockchain Products." (Dkt. 9 at ¶ 17).  All of these goods and services pertain to various aspects of the trading, storage, and safeguarding of digital cryptocurrencies.[2]

---

[1] We note that "for purposes of a Rule 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" *Volpe v. Am. Language Commc'n Ctr.*, 200 F. Supp. 3d 428, 430-31 (S.D.N.Y. July 29, 2016) (internal citations omitted).

[2] *See, e.g.*, *United States v. Ulbricht*, 858 F.3d 71, n.3 (2d Cir. 2017) (abrogated on other grounds by *United States v. Zodhiates*, 901 F.3d 137 (2d. Cir. 2018)) ("The [Bitcoin] currency is 'traceable' in that the transaction history of each individual Bitcoin is logged in what is called the blockchain. The blockchain prevents a person from spending the same Bitcoin twice, allowing Bitcoin to operate similarly to a traditional form of currency. Bitcoin is also a completely decentralized currency, operating free of nation states or central banks; anyone who downloads the Bitcoin software becomes part of the Bitcoin network. The blockchain is stored on that network, and the blockchain

BLK filed its U.S. trademark application for the Block Design Mark on November 21, 2017, alleging first use in January 2017. (Dkt. 9-1 at 2).   The goods generally include downloadable mobile apps to "send, receive, store, and safeguard digital currency" in Class 9; provision of a cloud-based business directory in Class 35; provision of various types of financial information, including provision of a database featuring financial information about bitcoin transactions in Class 36; and provision of online services related to financial transactions related to bitcoin transactions in Class 42. (Dkt. 9-1 at 2-3).

BLK alleges that in February 2018, Paymium "announced that it would launch www.blockchain.io[3] as a new platform for its digital currency services …". (Dkt. 9 at ¶ 46).

On March 8, 2018, the Trademark Office issued an Office Action stating in part:

> Applicant must disclaim the wording "BLOCKCHAIN" because it merely
> describes an ingredient, quality, characteristic, function, feature, purpose, or use
> of applicant's goods and/or services, and thus is an unregistrable component of
> the mark.

(Declaration of Martin Schwimmer "Schwimmer Decl.", Ex. 1).  Five days later on March 13, BLK responded to the Office Action accepting the disclaimer that read, "[n]o claim is made to the exclusive right to use BLOCKCHAIN apart from the mark as shown." (Schwimmer Decl., Ex. 2).

---

automatically 'self-updates' when a Bitcoin transaction takes place."); *Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 218 (E.D.N.Y. Mar. 6, 2018) ("[Virtual currencies] are often described as 'cryptocurrencies' because they use 'cryptographic protocols to secure transactions … recorded on publicly available decentralized ledgers,' called "blockchains." . . . The 'blockchain' serves as a digital signature to verify the exchange.") (internal citations omitted); *Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, No. 18-CV-2897 (JPO), 2018 WL 2022626, at n.1 (S.D.N.Y. Apr. 30, 2018) ("Generally speaking, cryptocurrency coins or tokens are created and disseminated using distributed ledger or blockchain technology. . . . Blockchain uses cryptography to process and verify transactions: it is essentially 'an electronic distributed ledger ... that is maintained by various participants in a network of computers.'") (internal citations omitted).
[3] The BLOCKCHAIN.IO domain name uses the .IO top level domain name suffix. While delegated to the British Indian Ocean Territory, the TLD is "open" and available to any registrant. Thus, .IO domain names are popular to companies who want a brand ending in an "eee-oh" sound (as in "video" or "audio").

BLK's Registration issued July 10, 2018. (Dkt. 9 at ¶ 26).  The instant complaint was filed September 21, 2018. (Dkt. 9).

Defendant Paymium "is in the business of offering various cryptocurrency services, including cryptocurrency exchanges branded as PAYMIUM and BITCOIN CENTRAL." (Dkt. 9 at ¶ 42).  Paymium previously distributed "defunct" mobile wallets. (*Id.*).

Paymium is a French "simplified joint-stock company," with a principal place of business in Boulogne-Billancourt, France. Pierre Noizat is the Chief Executive Officer. It operates the PAYMIUM online exchange offering cryptocurrency transactions against the Euro. (*See* Schwimmer Decl., Ex. 3). It has no offices or employees in the U.S.

BLK alleges that in February 2018, Paymium "announced that it would launch www.blockchain.io[4] as a new platform for its digital currency services …". (Dkt. 9 at ¶ 46).

Paymium is promoting the introduction of a cryptocurrency exchange at its website BLOCKCHAIN.IO (the "Website"). Paymium displays the following logo on the homepage of the Website:



The static design above does not accurately reflect the appearance of the cube as rendered on the Website, which revolves continuously when a user is logged on, so as to suggest a transparent three-dimensional block.

---

[4] The BLOCKCHAIN.IO domain name uses the .IO top level domain name suffix. While delegated to the British Indian Ocean Territory, the TLD is "open" and available to any registrant. Thus, .IO domain names are popular to companies who wish to brand ending in an "eee-oh" sound.



Paymium offered an Initial Coin Offering (ICO) – an offering to sell tokens to individual investors ("BCIO Tokens"), which tokens were accompanied by certain rights, namely the right to receive discounts on trading fees on the planned BLOCKCHAIN.IO exchange services when available (Schwimmer Decl., Ex. 4 at 39). BCIO tokens are utility tokens. (Schwimmer Decl., Ex. 4).  Paymium filed a Form D with the Securities & Exchange Commission on May 23, 2018 identifying its intention to sell tokens.[5] (Dkt. 9-5).  Paymium makes available on the Website home page a downloadable Whitepaper, (Schwimmer Decl., Ex. 4), which Whitepaper carried a disclaimer, (Schwimmer Decl., Ex. 4 at 4), in conformity with Reg. 503 indicating that token sales to U.S. Persons were prohibited other than to Accredited Investors. (Schwimmer Decl., Ex. 4 at 4).

The Whitepaper and the Website articulate the specifics of the ICO, the terms and condition of token sales, the architecture of the planned Exchange, and the rights attendant to the BCIO tokens. *Id.*

The instant lawsuit was filed seven days prior to Paymium's ICO, which began on September 27, 2018.

Paymium intends for the Exchange to go live this February.

## LEGAL STANDARD

### I.   Motion to Dismiss

The pleading standards governing Rule 12(b)(6) motions are no doubt well-known to this Court such that no recital is necessary here. In short, "[d]etermining whether a complaint states a

---

[5] *See also Initial Coin Offerings (ICOs)*, https://www.sec.gov/ICO (last visited Jan. 11, 2019).

plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## ARGUMENT

**I.    Having Disclaimed the BLOCKCHAIN Trademark, BLK Does Not Have a Protectable Trademark Under Lanham Act § 32 and § 43(a)(1)(A)**

### A.    Introduction

The BLOCKCHAIN term, which BLK has admitted is descriptive of its goods and services, is the dominant element of all marks asserted by BLK. In addition to its putative BLOCKCHAIN word mark and Block Design Mark, its other claimed marks consist of the BLOCKCHAIN element accompanied by descriptive domain name suffixes (.COM and .INFO) or descriptive terms such as MERCHANT or PRINCIPAL STRATEGIES (none of which are used by Paymium). (Dkt. 9 at ¶ 24).

Paymium acknowledges that as a statistical matter, courts virtually never dismiss trademark causes pursuant to Rule 12(b)(6) based on a mark's distinctiveness, as distinctiveness is a question of fact.   However, the two most common fact patterns that support plausible assertions of distinctiveness are not present here:

(1)    While registered marks create presumptions of distinctiveness, here BLK disclaimed the exclusive rights in BLOCKCHAIN in its recent trademark application – not only is there no presumption of distinctiveness, but there is a presumption of descriptiveness;

(2)    Plaintiffs who may not rely on registered rights  can ordinarily plausibly assert that their exclusive use of their mark over time create secondary meaning.  Here, because BLK has admitted its mark was descriptive subsequent to Paymium's adoption of its own mark, and the Court can easily take judicial notice of extensive descriptive use, the Court should give no deference to BLK's implausible allegations of secondary meaning.

B.       **BLOCKCHAIN Is Descriptive of BLK's Goods and Services**

1.       **The Trademark Office Has Found That BLOCKCHAIN Is Inherently Descriptive, and BLK Acquiesced in That Determination**

To establish a claim under both §§ 32 (15 U.S.C. § 1114) and 43(a)(1)(A) (15 U.S.C. § 1125(a)(1)(A)), BLK must prove that its mark is either inherently distinctive or has acquired secondary meaning, and that its mark had achieved protectable status prior Paymium's first use of its date. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).

When BLK applied for its block design mark with the U.S. Trademark Office, it was asked to disclaim the BLOCKCHAIN term, as it was the Trademark Office's view that the term was descriptive in relation to BLK's good and services. (Schwimmer Decl., Ex. 1).  That BLK did not argue against that determination as it applied to some or all of its goods and services, is an admission by BLK that the term is inherently descriptive of all of its products. 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 19:65.  Furthermore, in its complaint, BLK acknowledges that "blockchain" describes the technology that underlies cryptocurrencies and digital currency, the subject matter of BLK's business. (Dkt. 9 at ¶ 5).  Thus, it is not disputed that the term "blockchain" is inherently descriptive of BLK's goods and services.

BLK concedes in its Complaint that it is not claiming "exclusive rights to the word 'blockchain' to describe the technology, but . . . claims exclusive rights to the BLOCKCHAIN marks,'" seemingly because of secondary meaning, because "it has been using [the marks] exclusively for its . . . [p]roducts," and that the marks "have become well and favorably known to consumers." (Dkt. 9 at ¶ 5).

If BLK is suggesting that there is a distinction between exclusive use as a trademark and exclusive use as a descriptive term, that is incorrect. The case law is clear: a descriptive term is not protectable unless the plaintiff establishes secondary meaning, which inquiry turns on

consumer perception. *See, e.g.*, *Star Indus. Inc. v. Bacardi & Co.*, 412 F.3d 373, 385 (2d Cir. 2005).  BLK's exclusive use of a term as a trademark is a necessary pre-condition to achieve secondary meaning, but it is not the determinative factor. Otherwise, if a party was the only one foolish enough to use "brown shoes" or "mobile phone" in trademark-like fashion, it would have a colorable claim to secondary meaning. Rather, BLK must allege plausible facts that (1) it is the sole user of BLOCKCHAIN as a trademark in relation to these goods and services; and (2) third-party use of the term is such that BLK's "name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor its meaning as a word identifying that business." *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe,* 131 F. Supp. 3d 196, 212 (S.D.N.Y. Sept. 18, 2015) (internal citations omitted).

### 2.   BLK Cannot Establish Secondary Meaning Prior To Paymium's February Adoption Of Its BLOCKCHAIN.IO Mark, Nor At Any Time

BLK would need to establish secondary meaning in the BLOCKCHAIN term prior to Paymium's adoption. *See Converse, Inc. v. Int'l Trade Comm'n*, 909 F.3d 1110, 1117-18 (Fed. Cir. 2018). Secondary meaning is established by "(1) advertising expenditures, (2) consumer studies linking the mark to source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 226 (2d Cir. 2012) (internal citations omitted).

Even at this early stage of the lawsuit, it is apparent from the pleadings that BLK had not achieved such meaning by Paymium's first use date, February 2018.  First, when BLK received the disclaimer request in March 2018, not only could it have argued over the inherent distinctiveness of the term, but it could have taken up to six months to respond to the office

action and accumulate and submit to the PTO evidence required to establish secondary meaning. Instead BLK waited three days and accepted the disclaimer on March 13, 2018 (a month after Paymium's alleged adoption of its BLOCKCHAIN.IO mark). (Schwimmer Decl., Ex. 2).

Although BLK could have amended its application to withdraw its disclaimer up through registration, *see* TMEP § 1505.02(e), BLK acquiesced in the PTO's disclaimer request, implicitly admitting that it could not show secondary meaning in the BLOCKCHAIN element up through July 2018, six months after Paymium's first use.

Furthermore, it is implausible that BLK can establish secondary meaning in the term as of any date, given the term's widespread use as describing the underlying technology of the parties' services.

Thus, the acceptance of the disclaimer is an admission that BLOCKCHAIN is descriptive of the goods and services identified in the trademark registration as of July 10, 2018. BLK alleges that Paymium adopted the mark no later than February 2018 – ***six months earlier***. This is the proper end of the trademark inquiry.

As BLK cannot establish protectable rights, it cannot succeed under any of its trademark or unfair competition causes. *See A.V.E.L.A., Inc.*, 131 F. Supp. 3d at 209 (noting that Lanham Act claims largely "mirror" the elements of unfair competition claims and trademark infringement claims under New York law).

### a.   BLK's Evidence of Secondary Meaning Is Sparse

To the extent BLK seeks to continue to assert right in BLOCKCHAIN, it cannot establish secondary meaning based on the allegations in its Complaint.  First, The Trademark Office cited evidence including a definition from the Merriam-Webster dictionary that "blockchain" refers to "a digital database, especially used with virtual currencies." (Schwimmer Decl., Ex. 1 at. 2).

9

There are no allegations as the advertising expenditures, consumer studies, or third party attempts to plagiarize the mark.  BLK itself seems to not believe its sales are insufficient, and most importantly, BLK's evidence of unsolicited media coverage belies its allegation of exclusivity of use, as does information the Court may take judicial notice of.

With regard to sales, BLK alleges that it has distributed 4.5 million wallets in the U.S. (Dkt. 9, ¶ 33), presumably for free.[6] Each wallet appears to have been used four times since 2011.[7] BLK also refers to apparent "considerable unsolicited media coverage" it has received in recent years. (Dkt. 9, ¶ 32), and claims it has derived unidentified "significant revenues" from their products through its use of the BLOCKCHAIN Marks.

As to the wallets, presumably it had a similar number in the millions in March 2018 that was not worthy of mention to the Trademark Office. (Schwimmer Decl., Exs. 1 and 2).  As to unsolicited press coverage, first, several of the articles themselves use "blockchain" descriptively. (Dkt. 9-3 at 4, 8).  Second, one of the publications cited, TechCrunch, ran an article entitled "The Company called Blockchain raises $40 Million," and the first three words of the article are "Blockchain (the company) . . .." (Schwimmer Decl., Ex. 6).  By using that parenthtical, the publication acknowledges that the primary significance of the term "blockchain" is the technology.

Furthermore, BLK itself uses the term BLOCKCHAIN descriptively defining the term in its glossary. (Schwimmer Decl., Ex. 7).

---

[6] *See* Schwimmer Decl., Ex. 5.
[7] BLK alleges that its 28 million wallets were involved in 100 million transactions. (Dkt. 9 at ¶ 2).  As for the dollar value of transactions alleged by BLK, that is as irrelevant to trademark strength of a digital wallet, as are denominations of paper currency for a leather wallet.

10

**b.  BLK's Assertion That It Is The Exclusive User OF BLOCKCHAIN Is Risible, Contradicted by Its Own Use and By Third Party Evidence**

BLK's claim of exclusive use of the term as a trademark should be shown no deference. This Court can take judicial notice of extensive third party use of entities using the term as part of their trading name, and to describe their services.

The U.S. Trademark Office TESS Database shows:

- 323 applications for marks containing the term "blockchain" overall;

- 120 applications which contain the term "blockchain" in the mark and "blockchain" in the identification of goods and services;

- 911 applications that contain the terms "blockchain" and "currency" in their identification of goods and services;

- 241 applications that contain the terms "blockchain" and "wallets" in their identification of goods and services; and

- 87 applications that contain "blockchain" in the name of the applicant and "blockchain" in the identification of goods and services.

(Schwimmer Decl., Exs. 8-12).[8]

Simply looking at the Federal Court docket shows BLK's claim of exclusive use of the term to be implausible, as there are five recently filed cases in this circuit involving a party whose name included BLOCKCHAIN. *See, e.g., Blockchain Mining Supply & Services Ltd. v. Super Crypto Mining, Inc.*, 1:18-cv-11099-ALC (S.D.N.Y. filed Nov. 28, 2018); *Blockchain Tech. Corp. v. RVH Inc.*, 1:18-cv-09352-AJN (S.D.N.Y. filed Oct. 12, 2018); *Sec. & Exch.*

---

[8] This court may take judicial notice of documents retrieved from official government websites, such as USPTO.gov and its ancillary sites. *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. Aug. 31, 2015) (noting that courts "routinely take notice of . . . government records" including, for example, Medicare.gov).

*Comm'n v. Titanium Blockchain Infrastructure Servs., Inc.*, 1:18-mc-01525-UAD (E.D.N.Y. filed June 4, 2018); *Sec. & Exch. Comm'n v. Titanium Blockchain Infrastructure Servs., Inc.*, 1:18-mc-00236-PKC (S.D.N.Y. filed June 4, 2018); *Davidson v. Long Blockchain Corp.*, 1:18-cv-02182-SN (S.D.N.Y. filed Mar. 12, 2018); [9]

As BLK would have to show exclusivity of use of the term such that its use "submerges" the primary meaning, it is implausible given the number of applicants who (1) wish to use BLOCKCHAIN as part of their trademark; (2) use the term BLOCKCHAIN as part of their trading name; (3) use the term 'blockchain' to describe goods or services related to those of BLK.

Federal courts have long recognized that, while not conclusive, "third party use of a substantially similar mark to promote the same goods or services to the same consumer class weighs against a finding that the consumer class associates the mark with one source." *See Echo Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264, 1269 (7th Cir. 1989); *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1403 (Fed. Cir. 1984). When consumers are met with more than one independent use of a term as a trademark, the term's distinctiveness declines. *See Echo Travel, Inc.*, 870 F.2d at 1269; *Levi Strauss & Co.*, 742 F.2d at 1403 ("When the record shows that purchasers are confronted with *more than one* (let alone numerous) independent users of a term or device, an application for registration under Section 2(f) cannot be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances") (emphasis added).

---

[9] We note that this court may take judicial notice of named parties in other actions. *See Johnson v. New York Univ.*, No. 17 Civ. 6184 (VEC) (GWG), 2018 WL 3966703, n.4 (S.D.N.Y. Aug. 20, 2018) (comparing the named defendants in the instant action with the named defendants in a prior action).

### C.  No Jury Will Find Similarity Between the Logo marks

To the extent BLK argues that it cannot assert a claim based on its logo, Paymium's logo bears no similarity to the protectible elements of BLK's block design logo. A Court may dismiss a trademark cause at the pleading stage when the degree of similarity overwhelms any possibility of confusion. *See Le Book Pub., Inc. v. Black Book Photography, Inc.*, 418 F. Supp. 2d 305, 311 (S.D.N.Y. 2005) (dismissing Plaintiff's claim for trademark infringement at motion to dismiss). While BLK alleges similarity between its block logo and Paymium's logo, the fonts are different, the weighting of the fonts are different, and the blocks are different.  The only common element of the two logos is the unprotectable BLOCKCHAIN element.  Where the only word in common is an unregistrable component of the mark, the court will not give weight to that component. *Cf. Abercrombie & Fitch Co., Hunting World, Inc*., 537 F.2d 4, 9 (2d Cir. 1976) (refusing for policy reasons to give weight to alleged secondary meaning in generic term, court holds that cumulative effects of the dissimilarity of the marks and form, look, and feel dispels any confusion).

### II.    BLK Cannot Succeed on Its False Advertising Claims

The complaint identifies three statements attributed to Paymium:

- an advertisement that erroneously indicates that Paymium's ICO would be registered by the SEC (the "SEC Statement") (Dkt. 9, ¶ 66);

- a claim that Paymium's Blockchain.io exchange will use of a technology known as 'atomic swaps' (the "Atomic Swaps Claim") (Dkt. 9 at ¶ 65); and

- a claim that Paymium has not been hacked since 2013 (the "2013 Hack Claim") (Dkt. 9 at ¶ 64).

BLK has not pled how it will be harmed by any of these statements and misquotes two of the statements.

## A. BLK Cannot Plead That It Was Proximately Injured By Any of Paymium's Statements

Because BLK is not a direct competitor of Paymium, and because the statements concern Paymium and not BLK (or an integrated partner of BLK), injury to BLK is not presumed. BLK must plead some basis for how it will establish that it is proximately harmed by the statements – specifically, that it can establish economic or reputational injury flowing directly from the deception.

Proximate injury is one prong of the two-prong test for false advertising as set out in *Lexmark*. *See Lexmark Int'l, Inc. v. Static Control Components*, 572 U.S. 118, 129 (2014) . The Lanham Act states, in relevant part, that a party that makes false or misleading statements in commercial advertising shall be liable to "*any person* who believes that he or she is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1)(B) (emphasis added). In *Lexmark*, Justice Scalia noted that "any person" is too expansive if read literally and held that a potential plaintiff's interests must fall within the "zone of interests" of the Lanham Act (i.e., someone participating in U.S. commerce). *See Lexmark Int'l*, 572 U.S. at 129. Additionally, the plaintiff's injury must have been proximately caused by defendant's acts. *See id.* A plaintiff under § 1125(a) "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *See id.* at 133.

Despite its conclusory pleadings, BLK, as it is not an exchange, is not a direct competitor of Paymium's planned Exchange. Furthermore, BLK and its goods and services were not the subject of Paymium's statements, and thus any conceivable injury is speculative (and not pled).

The two-prong *Lexmark* test works to expand the pool of potential false advertising claimants beyond direct competitors, to include integrated partners, one of whom competes with

14

defendant. For example, the plaintiff in *Lexmark* manufactured computer chips that were a key component in third-party ink cartridges that competed with the cartridges of defendant. Defendant's alleged false statement about the quality of plaintiff's chips proximately harmed plaintiff's sales, even though it did not directly compete with defendant.

> *Lexmark* describes another relationship where cognizable injury could result:

> Consider two rival carmakers who purchase airbags for their cars from different third-party manufacturers. If the first carmaker, hoping to divert sales from the second, falsely proclaims that the airbags used by the second carmaker are defective, both the second carmaker and its airbag supplier may suffer reputational injury, and their sales may decline as a result.

*Lexmark Int'l*, 572 U.S. at 138-39.  In contrast, certain types of harm are too remote to be deemed proximate. Landlords, or other vendors of the target of the false claims, may suffer, but will not be able to plead proximate cause. *See Id.* at 133-34.

Here, BLK did not plead a basis for showing proximate harm, nor a basis why proximate harm can be presumed, as did it not adequately plead either a direct relationship to the statements, or a suitable relationship to Paymium, that would allow for such a presumption.

Paymium's statements are claims about Paymium and its products, and do not refer to BLK or a partner of BLK. None of these statements identify competitors, even obliquely. When allegedly false statements are about one's own products, there is no presumption that a particular plaintiff will be injured because injury "accrues equally to all competitors." *See McNeillab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir. 1988).  As that plaintiff will have to show some indication of actual injury and causation, a plaintiff should have to allege facts that it could make such a showing. *See id.*

Furthermore, BLK is not a competitor of Paymium, despite its conclusory pleading.  The statement that Paymium's services are "identical or nearly identical" is conclusory and unsupported by the record. (Dkt. 9 at ¶ 49). BLK's digital wallet services are not competitive

with Paymium's BCIO currency exchange, in the same way that Charles Schwab's brokerage services are not direct competitors with Nasdaq's exchange services. BLK provides digital wallets and does not claim to be an exchange. It has not alleged that it intends to sell tokens, utility or otherwise.  Accordingly, it cannot be presumed that an alleged misstatement Paymium makes about its own exchange, directly injures BLK's digital wallet business.

BLK must show "economic or reputational injury flowing directly from the deception wrought by defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from plaintiff." *See Lexmark Int'l*, 572 U.S. at 133. BLK has not pled a basis as to how it can establish such direct injury.

## B. BLK's "Registered Security" Statement Is Not a Statement Promoting Paymium's Goods and Services

On May 23, 2018, Paymium filed a Form D with the U.S. Securities and Exchange Commission. (Dkt. 9-5, p. 6).  A Form D is used to file a notice that a particular offering of securities is a private placement targeted at accredited investors, and not a publicly available offering of stock that would be otherwise subject to SEC Registration rules. See https://www.sec.gov/ICO.  SEC rules allows for the public advertisement of such exempt private placements, provided that the securities are only sold to accredited investors. *Id*.

Paymium, a French company with no prior exposure to U.S. regulatory procedures, erroneously assumed that the act of filing its Form D with the SEC was equivalent to registering with the SEC, and in advertisements, stated that its initial coin offering was "registered with the SEC." (Dkt. 9-9, p. 2-3).  BLK's Exhibit I shows that in one such ad, Paymium provided a link to its Form D in close proximity to an ad using the erroneous "registration" language. (Dkt. 9-9). The link shows that the statement resulted from unfamiliarity by a French company with SEC terminology, and not from a desire to conceal. Any U.S. accredited investor would see from the

16

existence of the Form D alone that the ICO was an exempt offering. Paymium's Whitepaper clearly indicates that U.S. individuals were prohibited from buying tokens unless they were accredited investors. (Schwimmer Decl., Ex. 4 at 4).

In any event, BLK cannot bring a false advertising claim based on the SEC statement because (1) the advertisement in question was not an offering of goods or services in U.S. commerce; and, as discussed above, (2) BLK did not plead, and cannot show, proximate harm resulting from statements made by Paymium to its investors.

BLK alleges that Paymium's statements relating to its Form D were an attempt to secure U.S. investors.[10] (Dkt. 9 at ¶¶ 7, 10, 105).  Paymium's promotion of the ICO was to secure investors and therefore was not "commercial advertising or promotion" of Paymium's goods and services as covered by Section 43(a)(1)(B).  *See, e.g.*, *Gordon & Breach Sci. Publ'rs S.A. v. Am. Inst. Of Physics*, 859 F. Supp. 1521, 1535-36 (S.D.N.Y. Aug. 15, 1994).

### C. Paymium's Statement That Its Exchange Will Feature "Atomic Swaps" Is Clearly A Non-Falsifiable Prospective Statement

BLK's false advertising claim as it pertains to Paymium's statements that its products will feature "atomic swaps" in the future should be dismissed, as any statements made by Paymium involving atomic swaps were prospective statements that clearly describe the features for a future product, are non-falsifiable opinions, and thus are not falsifiable statements covered by Section 43(a)(1)(B). *Duty Free Americas, Inc. v. Estée Lauder Cos.*, No. 12–60741, 2014 WL 1329359 (S.D. Fla. Mar. 31, 2014).

An "atomic swap" is a technology that will allow for direct exchange of virtual goods across a network. Paymium agrees with BLK's assertion that while the technology is currently

---

[10] The token offered in an Initial Coin Offering is initially a security (which requires compliance with U.S. Regulation D.  After the ICO, the tokens are used to obtain services from the token offeror.  The advertisement in Exhibit I (dkt. 9-9) promotes the ICO and therefore promotes securities and not Paymium's goods and services.

being developed, it has not been commercially deployed. However, BLK alleges that Paymium made false statements "that it provides or will provide products that are unavailable." (Dkt. 9 at ¶ 105). Without providing exhibits or even quotes, BLK alleges that "Paymium advertises itself as providing services that it does not offer, including without limitation so called atomic swaps." (Dkt. 9 at ¶ 65).

Paymium discusses atomic swaps in its Whitepaper and on the Website, the Whitepaper by its nature its a "preview" of a service to be provided in the future.  The term "initial" in "initial coin offering" also suggests a beginning of a process. Paymium refers to atomic swaps thirteen times in its Whitepaper. (Schwimmer Decl., Ex. 4 at 5, 13, 14, 16, 18, 21, 22, 46, 47). All statements either explicitly indicate that Paymium's service will incorporate atomic swap technology in the future[11] or are present-tense statements of fact about an existing aspect of the technology (including a glossary definition of "atomic swaps").  There are no statements that suggest that atomic swaps are a feature of a current product.

Paymium's assertion that its services will contain atomic swaps in the future is a forward-looking opinion.  It is not capable of verification or refutation by means of objective proof in the present. "[S]tatements of opinion are generally not the basis for Lanham Act liability." *Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995) (citing RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 3 cmt. d (1993)).

### D. BLK's Allegation That Paymium Misrepresents Itself as Being "Hack-free Since 2013" is False on its Face

BLK makes the puzzling allegation that Paymium has made "the misleading statement that it has not been hacked since it became operational in 2013, leaving out that it has been operating since 2011 and that it was hacked in 2013." (Dkt. 9 at ¶ 64).  In supporting this

---

[11]  For example, "[t]he decentralized cross-chain settlement will be based on cross-chain atomic swaps." (Schwimmer Decl., Ex. 4 at 13)

allegation, BLK appended an excerpt from Paymium's Whitepaper. (Dkt. 9-8 at 2).[12]  It is not clear what BLK intended in this cause, but the excerpt states, in relevant part, that the founders of Blockchain.io "created Paymium in 2011," and that "Paymium has been operating hack-free since 2013." (*Id.*).   Accordingly, BLK's allegation is false on the face of the complaint.

## III.    BLK Has Not Pled a Cognizable Claim Under NYGBL § 349

New York General Business Law Section 349 (a) prohibits "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service" in the state of New York.  Under NYGBL § 349, a Plaintiff must show "(1) defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 305 (E.D.N.Y. 2014) (quoting *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)).

The overwhelming majority of courts in this Circuit have concluded that "the general variety of consumer confusion that is the gravamen of [a trademark infringement] claim" is an insufficient harm to the public interest for purposes of NYGBL § 49. *See Mayes v. Summit Entm't Corp.*, 287 F. Supp. 3d 200, 206 (E.D.N.Y. 2018) (collecting cases and analyzing governing state law); *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 352 (S.D.N.Y. 2014) ("[C]ourts in New York have routinely dismissed trademark claims brought under Sections 349 and 350 as being outside the scope of the statutes...."); *Toth v. 59 Murray Enterprises, Inc.*, No. 15 CIV. 8028 (NRB), 2019 WL 95564, at *13-14 (S.D.N.Y. Jan. 3, 2019) (denying summary judgment to plaintiff where there was no allegation of injury to public interest beyond consumer confusion).

The Complaint does not allege a harm above and beyond the general consumer confusion associated with the trademark claims and thus cannot on these facts state a claim under NYGBL § 349.

---

[12] An annotated version of this document is submitted herewith.  (Schwimmer Decl. Ex. 13).

**IV.    Defendant Noizat Should Not Be Charged as an Individual Party, as BLK Has Made No Specific Allegations of Direction and Control**

BLK has not plead sufficient allegations against Mr. Noizat to label him individually liable for each of BLK's claims.  In this Circuit, it is well-established that "under the Lanham Act, a corporate officer may be held personally liable for trademark infringement and unfair competition if the officer is a moving, active[,] conscious force [behind the defendant corporation's] infringement." *KatiRoll Co. v. Kati Junction, Inc.*, 33 F. Supp. 3d 359, 367 (S.D.N.Y. 2014). A corporate officer is considered a "moving, active, conscious force" behind a company's infringement when the officer "was either the sole shareholder and employee, and therefore must have approved of the infringing act, or a direct participant in the infringing activity." *Chloe v. Queen Bee of Beverly Hills, LLC*, No. 06–cv–3140, 2011 WL 3678802, at *4 (S.D.N.Y. Aug. 19, 2011) (abrogated on other grounds);  s*ee Chloé v. DesignersImports.com USA, Inc.*, No. 07-CV-1791 (CS)(GAY), 2009 WL 1227927, at *11 (S.D.N.Y. Apr. 30, 2009) ("[Individual defendant] was the founder, sole officer and sole shareholder of the [online company], and . . . as such he makes all the business decisions for the [online company], including the decision to purchase from third parties and offer for sale the counterfeit Chloé items . . ."); *Calvin Klein Jeanswear Co. v. Tunnel Trading*, No. 98 CIV. 5408 (THK), 2001 WL 1456577, at *6 (S.D.N.Y. Nov. 16, 2001) ("As its sole corporate officer and employee, [individual] defendant unarguably served as the moving, active, conscious force for [corporate defendant's] conduct").

Mr. Noizat is a co-founder and the CEO of Paymium. (Dkt. 9 at ¶ 11; Dkt. 9-4 at 8).  The complaint contains only conclusory allegations that Mr. Noizat "directed and controlled" the actions of Paymium (*e.g.*, Dkt. 9 at ¶ 44), that Mr. Noizat "has issued or directed Paymium to issue false or misleading statements," (Dkt. 9 at ¶¶ 11, 14), and that the complained-of acts

20

"were taken at the direction of or while Paymium was under the control of Mr. Noizat." (Dkt. 9 at ¶ 44).  However, there are no allegations that Mr. Noizat performed any role apart from what one would normally expect of a corporate officer, even a CEO, or that he was a moving, active, conscious force behind the alleged infringement.

Moreover, Mr. Noizat is one of thirteen Paymium employees identified on the BCIO website, in addition to fifteen advisors who also appear on the site. (*See* Dkt. 9-4 at 8-14; *Blockchain.io Team*, https://blockchain.io/#team (last visited Jan. 10, 2019)).  He is quoted in the Whitepaper and profiled as one of a ten-employee team. (*See* Schwimmer Decl. Ex. 4 at 9, 27).  There is no byline on the Whitepaper other than to attribute it to Blockchain.IO.  Thus, the complained-of statements are not attributable to Mr. Noizat.

Here, there are no allegations that Mr. Noizat's participation in the complained-of behavior exceeded the normal role one would expect from a CEO.  He is not the sole owner, sole officer or sole decision maker.

## V.   There is No Personal Jurisdiction Over the Individual Defendant Pierre Noizat

### A.   The Basis For Jurisdiction Over Mr. Noizat Is Not Derivative Of The Basis For Paymium

BLK bears the burden of establishing the jurisdiction is proper. *See DiStefano v. Carozzi North Am., Inc.*, 286 F.3d 81, 84 (2nd Cir. 2001).  To determine personal jurisdiction over a non-domiciliary, the Court must engage in a two-step analysis. *See Chloé v. Queen Bee of Beverly Hills*, 616 F.3d 158, 163-64 (2d Cir. 2010).  First the Court must apply the forum state's long-arm statute. *Id*. at 163.

Mr. Noizat is the CEO and co-Founder of Paymium. As stated above, he is one of several officers depicted on the Paymium and Blockchain.io website. He is one of thirty employees identified in the Whitepaper. There are no allegations that he has a specific relationship to

21

Paymium, or that he undertook specific conduct with regard to the complained-of acts that suggest why he may have "directed" or "controlled" Paymium in a way that suggests individual liability.

BLK attempts to piggyback its allegation of personal jurisdiction over Mr. Noizat on its allegations of personal jurisdiction over Paymium. However, under New York's long arm statute, N.Y. C.P.L.R. § 302(a), the basis for personal jurisdiction over an individual defendant is not derivative of the basis for personal jurisdiction over a corporate defendant without allegations of "sufficient facts from which the individual defendants' actual participation in the alleged wrongful acts could reasonably be inferred." *Wolo Mfg. Corp. v. ABC Corp.*, No. 17-CV-5333(SJF)(SIL), 2018 WL 5831767 at *10 (E.D.N.Y. Nov. 7, 2018).  There are no allegations that Mr. Noizat was any kind of "primary actor" in any New York transaction. *See Rovio Entm't, Ltd. v. Allstar Vending, Inc.,* 97 F. Supp. 3d 536, 542 (S.D.N.Y. 2015).  Merely concluding that Mr. Noizat must have directed or controlled the complained of acts by virtue of his title does not suffice. *Levin v. Am. Document Servs., LLC.*, No. 17-cv-1295, 2018 WL 1358815, at *3 (E.D.N.Y. Mar. 16, 2018). The Court is not bound by conclusory allegations that, for example, Mr. Noizat "directed use of the Infringing Marks in bad faith." without more. *See Wolo Mfg. Corp.*, 2018 WL 5831767 at *10.  Thus, BLK's allegations fail to provide a basis to support jurisdiction over Mr. Noizat under the New York long arm statute.

### B.  Personal Jurisdiction Over Mr. Noizat In His Individual Capacity Does Not Comport with the Due Process Clause

Should the Court find that Mr. Noizat is subject to personal jurisdiction under New York's long arm statute, which he isn't, the second step of the inquiry is to determine whether the exercise of personal jurisdiction over the defendant comports with the Due Process Clause of the U.S. Constitution. *Rovio Entm't*, 97 F. Supp. 3d at 543. Due process requires the defendant

to have sufficient minimum contacts with the forum state and for the assertion of jurisdiction to be reasonable. *Id*. BLK has failed to allege any specific contacts that Mr. Noizat has with New York.  Further, exercise of jurisdiction over Mr. Noizat personally in this matter offends the "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash. Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).

## VI.   BLK Has Not Pled a Cognizable Claim Under NYGBL § 350

New York General Business Law Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in the state of New York. To the extent that it applies to the Whitepaper, the Whitepaper says on its face that it is targeted only at "U.S. accredited investors."

## VII.   BLK Has Not Pled a Cognizable Claim Under NYGBL § 360-L

New York General Business Law Section 360-L (a) permits injunctive relief where there is a "[l] ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name . . . in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." To properly make a dilution claim under New York law, "the plaintiff must plead the existence of '(1) a distinctive mark capable of being diluted, and (2) a likelihood of dilution.'" *See A.V.E.L.A., Inc. v. Estate of Marilyn Monroe,* 131 F. Supp. 3d 196, 211-12 (S.D.N.Y. Sept. 18, 2015) (internal citations omitted). For the reasons stated above, BLK has failed to properly allege a distinctive mark or a likelihood of confusion.

23

## VIII.   BLK Has Not Pled a Cognizable Claim of Unfair Competition Under New York Common Law

The elements of an unfair competition claim in New York are largely identical to those under the Lanham Act. *See A.V.E.L.A., Inc.*, 131 F. Supp. 3d at 209. In addition, a party asserting an unfair competition claim in New York must also allege bad faith. *See id.*

BLK's allegations regarding bad faith are conclusory and insufficient. Even assuming, *arguendo*, that BLK has sufficiently pled that Paymium acted in bad faith (Dkt. 9 at ¶¶ 70-93), BLK cannot plead a colorable claim under the Lanham Act for the reasons articulated above. Accordingly, BLK's claim of unfair competition under New York common law fails as a matter of law.

## IX.   BLK Has Not Pled a Cognizable Claim of Misappropriation Under New York Common Law

BLK's claim for misappropriation under New York Common law is based solely on BLK's alleged "property interest in the BLOCKCHAIN Marks and associated reputation and goodwill." (Dkt. 9 at ¶117).  Under current New York law, in order to sustain a cause of action for unfair competition under a theory of misappropriation, a plaintiff must demonstrate, in addition to bad faith, that it has a valid property interest its trademark including, where the mark is descriptive, a showing of secondary meaning. *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 328 (S.D.N.Y. 2012), as amended (Sept. 19, 2012); *ITC Ltd. v. Punchgini, Inc.*, 518 F.3d 159, 191 (2d Cir. 2008) (plaintiff "must adduce proof of both deliberate copying and secondary meaning"). For the reasons set forth above, BLK has not and cannot establish secondary meaning in the BLOCKCHAIN mark prior to Paymium's adoption. Finally, BLK's allegations of bad faith are conclusory.

24

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' claims prejudice pursuant to Federal Rule 12(b)(6) and further with respect to Defendant Noizat pursuant to Federal Rule 12(b)(2).

Respectfully submitted,

Dated:   January 11, 2019
         White Plains, New York

Martin Schwimmer
LEASON ELLIS LLP
One Barker Avenue
White Plains, New York 10601
Phone:  (914) 288-0022
Fax:  (914) 288-0023
Email: schwimmer@leasonellis.com

*Attorneys for Defendants*

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of January, 2019, a true and correct copy of the foregoing DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT, was served upon all counsel of record by operation of the Court's electronic filing system.


/s/ Martin B. Schwimmer
Martin B. Schwimmer